IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHRISTINE BRUNER,              )      CASE NO. 1:20-CV-1685

                )

           Plaintiff,      )      JUDGE PAMELA A. BARKER

                )

        v.             )      MAGISTRATE JUDGE

                )      AMANDA M. KNAPP

COMMISSIONER OF SOCIAL   )

SECURITY ADMINISTRATION,   )

                )      **REPORT AND RECOMMENDATION**

           Defendant.     )

Plaintiff Christine Bruner ("Plaintiff" or "Ms. Bruner") [1] seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Medicare Qualified Government employee benefits.  (ECF Doc. 17.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

---

[1] Ms. Bruner identified herself as Christina Javens at her April 11, 2019 hearing, following a reported marriage and name change. (Tr. 44.)  Because the relevant filings continue to use the name Bruner, that is the name used herein.

1

## I.  Procedural History

On July 7, 2016, Ms. Bruner filed an application for SSI and Medicare Qualified Government Employee benefits.  (Tr. 277-79.)  She alleged a disability onset date of April 15, 2011, which she later amended to August 11, 2016.[2]  (Tr. 48.)  She sought disability due to atrial fibrillation, hypertension, diabetes, neuropathy, chronic obstructive pulmonary disorder ("COPD"), a pacemaker, cardiomyopathy, inability to sleep, sick sinus syndrome, and depression (Tr. 48.  Ms. Bruner's application was denied initially and upon reconsideration, and she requested a hearing.  (Tr. 121-122, 157-58.)  On April 11, 2019, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 42-59.)

On May 6, 2019, the ALJ issued a decision finding that Ms. Bruner had not been under a disability within the meaning of the Social Security Act from August 11, 2016 through the date of the decision.  (Tr. 12-41.)  On June 4, 2020, the Appeals Council denied Ms. Bruner's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

On July 30, 2020, Ms. Bruner filed her Complaint to challenge the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in this case.  (ECF Docs. 17, 19.)  The sole legal issue asserted by Ms. Bruner is that the ALJ erred in analyzing the treating source opinion of Dr. Amanda Kovolyan.  (ECF Doc. 17 p. 2.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Bruner was born in 1966 and was 50 years old on the alleged disability onset date, making her an individual closely approaching advanced age under Social Security Regulations.

---

[2]  The amended onset date was necessitated by a prior ALJ decision, issued on April 24, 2016, which found that Ms. Bruner was not disabled from April 15, 2011 through April 24, 2016.  (Tr. 66.)  That prior determination is final and subject to *res judicata,* and will not be relitigated here.  *Drummond v. Comm'r of Soc. Sec*., 126 F.3d 837, 842 (6th Cir. 1997).

(Tr. 48.)  She had a high school education.  (Tr. 57.)  Ms. Bruner last worked in 2011, when she worked as a nurse's aide.  (Tr. 48, 697.)

**B.      Medical Evidence**

      **1.      Treatment History**

             **i.      Evidence Predating the Alleged Onset Date**[3]

An x-ray of Ms. Bruner's knees taken on January 15, 2014, indicated minimal bilateral knee joint osteoarthritis, slightly more pronounced on the right side.  (Tr. 661.)

On March 27, 2015, Ms. Bruner presented at Bucyrus Community Hospital, complaining of shortness of breath with chest pain.  (Tr. 66.)  She underwent a cardiac SPECT test, which Dr. Ronald D. Frazier found to indicate global hypokinesis with estimated ejection fraction of 28%.  (Tr. 668.)  On April 7, 2015, Ms. Bruner followed up with Dr. Frazier at Ohio Health Heart and Vascular Physicians.  (Tr. 457.)  Dr. Frazier's impression was euvolemia with cardiomyopathy of unclear etiology with a negative myocardial perfusion scan for ischemia, ejection fraction of 28%-29% on gated study, chronic atrial fibrillation with a history of Tachy-brady syndrome status post pacemaker, chronic anticoagulation, history of anemia, history of premature ventricular contractions, history of left ventricular hypertrophy, hypertension, history of mild pulmonary hypertension, and dyslipidemia.  (Tr. 457-58.)  He adjusted her medications, which included aspirin, simvastatin, lisinopril, digoxin, warfarin, hydrochlorothiazide, metformin, spironolactone, Zoloft, amiodarone, and metoprolol succinate.  (Tr. 458.)

On June 8, 2015, Ms. Bruner followed up with Dr. Steve Nelson at Ohio Health Heart and Vascular Physicians for device and atrial fibrillation management.  (Tr. 456.)  Ms. Bruner reported recent problems with dyspnea on exertion and fatigue.  (*Id.*)  On examination, all

---

[3]Ms. Bruner cited a significant amount of evidence from the time prior to her amended alleged onset date in this case, most of which also predates a prior ALJ decision issued on April 24, 2016.

findings were within normal limits except for an irregular heartbeat.  (*Id.*)  Dr. Nelson's impression was chronic atrial fibrillation with intermittent rapid ventricular response, normal pacemaker function, cardiomyopathy which may be tachycardia mediated, and moderate effort intolerance.  (*Id.*)

Ms. Bruner followed up with Dr. Frazier on July 6, 2015.  (Tr. 454.)  Dr. Frazier noted Ms. Bruner denied orthopnea, pedal edema, palpitations, syncope or near syncope.  (*Id.*)  On examination, all his findings were in the normal range except for "irregularly irregular" pulse and "irregularly regular rhythm" of her heartbeat.  (*Id.*)  Dr. Frazier's impression was euvolemic with idiopathic cardiomyopathy with negative myocardial perfusion scan, ejection fraction approximately 38% per echocardiogram, chronic atrial fibrillation, chronic anticoagulation with warfarin, history of anemia, history of premature ventricular contractions, history of left ventricular hypertrophy, hypertension, mild-to-moderate pulmonary hypertension, dyslipidemia, and status post cesarean section x4. (Tr. 455.)  Dr. Frazier noted an echo with doppler indicated Ms. Bruner had mild left ventricular dilation with moderate global hypokinesia, severely dilated left atrium, elevated RVSP consistent with moderate pulmonary hypertension, and atrial fibrillation.  (Tr. 484.)  He ordered laboratory testing in preparation for adjusting Ms. Bruner's medications.  (*Id.*)

An x-ray of Ms. Bruner's chest taken on July 9, 2015, showed "Stable nonacute chest. Similar cardiomegaly."  (Tr. 474.)  A pulmonary function test performed the same day indicated possible early obstructive pulmonary impairment.  (Tr. 479.)  Repeat testing following bronchodilator administration showed significantly increased forced expiratory flow, indicating Ms. Bruner would benefit from continued bronchodilator therapy.  (*Id.*)

4

On August 18, 2015, Ms. Bruner presented at Bucyrus Community Hospital emergency department complaining of increasing shortness of breath, chest pain and palpitations. (Tr. 459, 565.) She was found to be in atrial fibrillation with rapid ventricular response and a pulse rate of 142 beats per minutes, and was hypertensive and mildly hypoxic. (*Id*.) The impression of attending physician Dr. James Dale Heddleson was atrial fibrillation with rapid ventricular response, exacerbation of chronic obstructive pulmonary disease, history of hypertension, history of hyperlipidemia, history of diabetes mellitus, and history of sick sinus syndrome, status post permanent pacemaker. (Tr. 460.) An x-ray of her chest indicated multichamber cardiomegaly, pacemaker, and residual right base atelectasis or effusion. (Tr. 470.) A CT angiography of Ms. Bruner's pulmonary arteries revealed pericardial effusion, cardiomegaly with a left pectoral pacemaker, mild right pleural effusion with minimal left pleural effusion, both of which were causing compressive atelectasis of the posterior lower lungs. (Tr. 481-82, 566.) It also showed enlarged lymphadenopathy in the mediastinal and right hilar region, and multiple areas of developing groundglass infiltrate in the lungs. (Tr. 482.) She was treated with IV Cardizem, and Dr. Heins was consulted. (Tr. 565.) She was discharged on August 20, 2015, reportedly "feeling well," with instruction to follow up with Dr. Heins in two weeks, and also consult with an electrophysiologist. (Tr. 566.)

An x-ray of Ms. Bruner's chest taken August 26, 2015, indicated persistent right basilar opacity consistent with small pleural effusion and atelectasis. (Tr. 472.)

On September 16, 2015, Ms. Bruner followed up with Dr. Gregory Heins at Ohio Health Heart and Vascular Physicians. (Tr. 394.) Ms. Bruner reported shortness of breath and occasional chest pain with exertion. (Tr. 395.) Dr. Heins opined that a stress SPECT performed in March 2015 revealed a medium to large size apical infarction. (*Id*.) He noted "there appears

5

to be minimal peri-infarction ischemia" and "she remains in atrial fibrillation with a controlled ventricular response." (*Id*.)  Dr. Heins wrote: "Her EKG performed today shows a probable extensive infarction. I am concerned her current symptoms represent class 3 angina. Her ejection fraction earlier this year was as low as 22% by SPECT imaging." (*Id*.)  On exam, all areas were within normal limits, except Dr. Heins noted trace edema.  (Tr. 396.)  Dr. Heins referred Ms. Bruner for a left heart catheterization.  (*Id*.)

Ms. Bruner underwent the recommended left heart catheterization with selective coronary angiography and left ventriculography via right transradial approach on September 28, 2015. (Tr. 463.)  The diagnoses were moderate left ventricular systolic dysfunction with ejection fraction of 40%, normal left ventricular and end-diastolic pressure, and plaque disease in the major epicardial conduits.  (Tr. 464.)  Following the procedure, Dr. Heins recommended ACE inhibitors and Carvedilol, as well as long-term anticoagulation with Coumadin and risk factor modification.  (*Id*.)

On September 29, 2015, Ms. Bruner presented to Dr. Nelson for possible cardioversion for atrial fibrullation.  (Tr. 526.)  Dr. Nelson's impression was chronic atrial fibrillation, with the rate under much better control; mild left ventricular systolic dysfunction and normal VVI pacemaker.  (*Id*.)  He noted that since starting Cardizem, Ms. Bruner reported feeling well, with no chest pain and significant improvement in dyspnea on exertion.  (*Id*.)

On October 6, 2015, Ms. Bruner followed up with Dr. Heins, who noted the recent heart catheterization showed mild to moderate coronary artery disease described as plaque.  (Tr. 405.) Ms. Bruner denied chest pain and shortness of breath, and all areas were within normal limits on examination, including normal rate and regular rhythm of heartbeat.  (Tr. 406.)  Dr. Heins opined

Ms. Bruner was stable and compensated from a heart failure standpoint, and re-stressed salt and fluid management, as well as daily weights.  (Tr. 407.)

Ms. Bruner underwent elective DC cardioversion on January 4, 2016.  (Tr. 510.)  Dr. Nelson performed a successful cardioversion of atrial fibrillation to normal sinus rhythm with a single shock.  (*Id*.)  He noted normal pacemaker function.  (*Id*.)

On February 5, 2016, Ms. Bruner followed up with Dr. Heins, who performed an EKG which confirmed she remained in sinus rhythm.  (Tr. 415-16.)  Ms. Bruner reported sporadic, although rare, dyspnea on exertion, and "state[d] she fe[lt] markedly improved."  (Tr. 416.)

On March 11, 2016, Ms. Bruner presented to the Bucyrus Community Hospital emergency department for treatment of chest congestion that began gradually one week earlier, reporting that when her family took her blood pressure at home, the wrist monitor suggested her systolic pressure was in the 90s.  (Tr. 586.)  On examination, attending physician Dr. Kevin Bercik noted results were within the normal range, including regular heart rate and rhythm.  (Tr. 587.)  An EKG confirmed she remained in sinus rhythm.  (Tr. 588.)  Dr. Bercik's final impressions were COPD and bronchitis, and Ms. Bruner was discharged with prescriptions for Augmentin and Guaifenesin, and advised to follow up with Dr. Kovolyan if her symptoms did not improve within three to five days.  (Tr. 588-89.)

On April 12, 2016, Ms. Bruner presented to Dr. Amanda Kovolyan for treatment of type two diabetes with diabetic neuropathy.  (Tr. 821.)  Ms. Bruner reported burning/sharp pains in her extremities.  (*Id*.)  Dr. Kovolyan noted Ms. Bruner was doing a "GREAT JOB!" and had successfully controlled her diabetes with diet and medication.  (*Id*.)  Dr. Kovolyan's physical exam revealed normal findings except for thickened nails on all her toes, and loss of protective sensation in her feet.  (Tr. 824.)  Dr. Kovolyan also observed new neuropathy on a monofilament

7

exam of Ms. Bruner's left foot.  (Tr. 824.)  She prescribed gabapentin at night, and counseled Ms. Bruner on proper footwear.  (*Id*.)

On April 26, 2016, a prior ALJ denied Ms. Bruner's then-pending claim for disability benefits (Tr. 60-85), finding Ms. Bruner capable of performing light work with additional specified physical limitations (Tr. 75-76).

On May 5, 2016, Dr. Heins performed a transthoracic echocardiogram that indicated Ms. Bruner's left ventricular size was mildly dilated.  (Tr. 426.)  Dr. Heins also noted mild decrease in left ventricular systolic function, stage 1 diastolic dysfunction, the left atrium was mildly dilated, there was mild tricuspid regurgitation, and there was evidence of mild pulmonary hypertension, all of which was "similar to previous" findings.  (*Id*.)  Ms. Bruner reported mild dyspnea on exertion which was sporadic and dependent on the weather.  (Tr. 441.)  On examination, all results were within normal limits.  (Tr. 443.)  Dr. Heins concluded Ms. Bruner's atrial fibrillation and cardiomyopathy appeared stable, and she was on guideline directed optimal medical therapy.  (*Id*.)  He opined "I believe her dyspnea is related to her chronic obstructive lung disease."  (Tr. 443-44.)

On May 16, 2016, Ms. Bruner returned to Dr. Kovolyan for treatment of moderate neuropathy.  (Tr. 816.)  Ms. Bruner reported experiencing constant numbness, burning, and aching in her feet.  (*Id*.)  The gabapentin prescribed a month earlier helped at first, but her symptoms returned.  (*Id*.)  On examination, Dr.  Kovolyan noted normal findings except for an abnormal monofilament exam.  (Tr. 818.)  She opined the neuropathy was unchanged, and increased Ms. Bruner's dosage of gabapentin.  (Tr. 819.)

Ms. Bruner participated in a sleep study at Ohio Health Mansfield Sleep Disorder Center on June 15, 2016.  (Tr. 525, 688.)  Dr. Sunil J. Vaidya's impression was obstructive sleep apnea

with hypoxia and insomnia.  (Tr. 688.)  Her cardiac rhythm was normal throughout.  (Tr. 525.)

Dr. Vaidya recommended she return to the lab for nasal CPAP/Bilevel treatment.  (Tr. 688.)

On June 16, 2016, Ms. Bruner saw Dr. James D. Heddleson for treatment of asthma.  (Tr.

542.)  Ms. Bruner reported dry cough, dyspnea with intense or moderate exercise, productive

cough, and wheezing which fluctuated and occurred intermittently.  (*Id*.)  On examination, Dr.

Heddleson noted normal findings except for decreased breath sounds, and his assessment was

asthma, cough, and atrial fibrillation.  (Tr. 545-46.)  On the same day. Ms. Bruner saw Dr.

Kovolyan for treatment of type 2 diabetes with diabetic neuropathy.  (Tr. 811.)  Ms. Bruner

reported numbness in the bilateral lower legs, with 25-50% improvement in this problem with

gabapentin.  (*Id*.)  Noting that the current dose of gabapentin was not causing drowsiness, Dr.

Kovolyan increased Ms. Bruner's gabapentin dosage.  (*Id*.)

### ii.    **Evidence After the Alleged Onset Date**

On September 7, 2016, Ms. Bruner followed up with Dr. Vaidya of Midwest Sleep

Consultants.  (Tr. 689.)  Dr. Vaidya treated Ms. Bruner with nasal CPAP therapy and

recommended she continue with CPAP therapy, and have yearly visits to monitor her care.  (*Id*.)

On September 26, 2016, Ms. Bruner retuned to Dr. Kovolyan for treatment of type two

diabetes with diabetic neuropathy, and mood/affective disorder.  (Tr. 802.)  Dr. Kovolyan noted

that Ms. Bruner's diabetes was "stable," and Ms. Bruner "has no concerns" about her physical

health.  (*Id*.)  Ms. Bruner reported increased yelling at her family members, with no triggers.

(*Id*.)  Dr. Kovolyan increased her dosage of Zoloft to 100 mg per day, and recommended she

follow up in six weeks for treatment of her mood disorder.  (Tr. 805.)

On November 7, 2016, Ms. Bruner sought treatment from Dr. Glen Eric Cooke at Ohio

Health Heart and Vascular Physicians.  (Tr. 717.)  Ms. Bruner reported "she had generally done

well" since May 2016, but continued to experience some dyspnea on exertion.  (Tr. 718.)  On examination, all findings were within the normal range, except for bradycardia and distant heart sounds.  (Tr. 721.)  Dr. Cooke assessed atrial fibrillation, sick sinus syndrome, hyperlipidemia, hypertension, cardiomyopathy, coronary artery disease, diabetes mellitus, and obesity.  (Tr. 722.)  An x-ray of Ms. Bruner's chest taken the same day showed no acute cardiopulmonary abnormality and stable cardiomegaly.  (Tr. 737.)

On November 8, 2016, Ms. Bruner followed up with Dr. Kovolyan for treatment of her mood disorder.  (Tr. 779.)  Ms. Bruner reported doing "somewhat better" since her Zoloft was increased, explaining her crying bouts had improved but she continued to have difficulty falling and staying asleep, and "flipping out."  (*Id*.)  Dr. Kovolyan again increased her dosage of Zoloft to 150 mg per day, and recommended she follow up in a month.  (*Id*.)

On December 8, 2016, Ms. Bruner followed up with Dr. Heddleson for treatment of asthma and cough.  (Tr. 785.)  Ms. Bruner reported symptoms that fluctuated and occurred intermittently, including dry cough, dyspnea with intense exercise, dyspnea with moderate exercise, postnasal drainage, and productive cough.  (*Id*.)  On examination, all findings were in the normal range.  (Tr. 788.)  Dr. Heddleson continued her current treatment, and recommended Ms. Bruner return in one year.  (Tr. 789.)

On December 9, 2016, Ms. Bruner returned to Dr. Kovolyan for treatment of her unspecified mood disorder and hypertension.  (Tr. 774.)  Ms. Bruner reported "doing OK" on her current medications, though she was "still a little 'snippy'."  (*Id*.)  She continued to have trouble falling asleep and staying asleep and mood swings.  (*Id*.)  Noting that the increased dosage had not provided any additional benefit, Dr. Kovolyan discontinued Zoloft, and prescribed Cymbalta. Tr. 777.  Dr. Kovolyan noted that both today and at yesterday's pulmonary appointment, Ms.

Bruner's blood pressure was "way too high" and instructed her to report this issue to Dr. Cooke, her cardiologist.  (*Id*.)

Ms. Bruner followed up with Dr. Kovolyan on January 27, 2017, for treatment of diabetes.  (Tr. 841.)  She reported dysesthesias.  (Tr. 843.)  On exam, Dr. Kovolyan again noted thickened toenails, abnormal monofilament exam and loss of protective sensation.  (Tr. 844.)  She determined the diabetes was controlled and no changes in treatment were necessary.  (*Id*.)

On March 10, 2017, Ms. Bruner returned to Dr. Kovolyan for treatment of her mood/affective disorder.  (Tr. 836.)  She reported that she was unable to start Cymbalta because of insurance coverage, and that Effexor had been ineffective.  (*Id*.)  She reported being irritable, having difficulty falling and staying asleep, and experiencing mood swings.  (*Id*.)  Dr. Kovolyan discontinued Effexor, prescribed Paxil, and advised her to follow up in six weeks.  (Tr. 839.)

Ms. Bruner followed up with Dr. Kovolyan again on April 12, 2017, for treatment of mood disorder, and acute serous otitis media (left ear).  (Tr. 831.)  Ms. Bruner described functioning as "not difficult at all," but reported trouble falling and staying asleep, and fatigue.  (*Id*.)  She reported her mood was "25% better," explaining, "I'm not snapping as much anymore."  (*Id*.)  She reported her CPAP machine was not helping.  (*Id*.)  Dr. Kovolyan increased her dosage of Paxil and treated her ear infection with amoxicillin.  (Tr. 834.)

On June 14, 2017, Ms. Bruner returned to Dr. Kovolyan for treatment of diabetes with neuropathy and hypertension.  (Tr. 826.)  She reported burning sensations and nocturnia.  (*Id*.)  On examination, she was noted to be overweight, with an "irregularly irregular" heart rhythm and an abnormal monofilament exam with loss of protective sensation in the feet.  (Tr. 829.)

On November 8, 2017, Ms. Bruner retuned to Dr. Cooke for treatment of atrial fibrillation, sick sinus syndrome, hyperlipidemia, hypertension, cardiomyopathy, coronary artery

11

disease, diabetes, and obesity.  (Tr. 943.)  Ms. Bruner reported dyspnea on exertion, and stated "she has done well from an overall CV standpoint" since her last visit in May 2017, and "she remains active."  (Tr. 945.)  Dr. Cooke opined her coronary artery disease, cardiomyopathy, and hypertension were stable, and discontinued her low dose moderate intensity statin therapy to begin low dose high intensity statin therapy.  (Tr. 944.)

On December 14, 2017, Ms. Bruner returned to Dr. Heddleson and reported fluctuating problems breathing, including sputum production and wheezing.  (Tr. 888-89.)  She also noted dyspnea, cough, and chest discomfort.  (Tr. 889.)  On examination, all findings were in the normal range.  (*Id*.)  Dr. Heddleson noted she had been unable to obtain Symbicort due to insurance coverage and switched her to Breo for treatment of her COPD.  (Tr. 890.)

On December 15, 2017, Ms. Bruner saw Dr. Kovolyan for a follow-up diabetic visit.  (Tr. 887.)  Dr. Kovolyan described Ms. Bruner's disease course as "stable," and noted "[h]ypoglycemic symptoms include mood changes," and "[s]he never participates in exercise." (*Id*.)  No changes were made to Ms. Bruner's medications.  (Tr. 888.)

From December 21-23, 2017, Ms. Bruner was hospitalized for treatment of influenza and acute exacerbation of COPD.  (Tr. 868.)  A December 21, 2017 chest x-ray indicated mild cardiomegaly without acute cardiopulmonary disease.  (Tr. 911.)  Treatment with Tamiflu and prednisone taper was successful.  (Tr. 868.)  After two days of care, she reported "feeling much better" and was discharged home.  (*Id*.)

On December 29, 2017, Ms. Bruner returned to Dr. Kovolyan to follow up on shortness of breath after her recovery from flu.  (Tr. 866.)  Ms. Bruner reported "gradually improving," but her shortness of breath and coughing were aggravated by exertion.  (*Id*.)

On May 8, 2018, Ms. Bruner returned to Dr. Cooke for treatment of atrial fibrillation, sick sinus syndrome, hyperlipidemia, hypertension, cardiomegaly, coronary artery disease, cardiac pacemaker in situ, diabetes mellitus, and obesity.  (Tr. 950.)  She reported "she has generally done well" since her November 2016 visit, and "remains active and without CV symptoms or complaints."  (*Id.*)  She described "walking on an every other day basis for a couple of hours a day," and experienced "some dyspnea on exertion, although not significantly worse." (*Id.*)  Dr. Cooke's examination results were in the normal range, and he recommended she follow up in 6 months.  (Tr. 950, 954.)

On June 8, 2018, Ms. Bruner treated with Dr. Kovolyan and reported foot paresthesia and burning in her right foot.  (Tr. 862.)  Ms. Bruner reported gabapentin helped, but that she still noted burning throughout the day, and the pain sometimes interfered with her sleeping.  (*Id.*) She also reported that she continued to experience mood swings.  (*Id.*)  On examination, all findings were in the normal range.  (*Id.*)  Dr. Kovolyan noted Ms. Bruner's symptoms were stable, and continued her medications.  (Tr. 862-63.)

On November 8, 2018, Ms. Bruner saw Dr. Cooke and reported she had "generally done well" since her May 2018 visit, and "remains active and is essentially without cardiovascular symptoms or complaints."  (Tr. 977-78.)  Dr. Cooke indicated that her atrial fibrillation, sick sinus syndrome, hyperlipidemia, cardiomyopathy, and coronary artery disease, diabetes mellitus, were stable.  (Tr. 976-77.)  He noted her hypertension remained "minimally elevated," and counselled Ms. Bruner on the importance of weight loss.  (Tr. 976.)

On December 20, 2018, Ms. Bruner saw Dr. Heddleson and reported daily fluctuating shortness of breath and some intermittent coughing and pleuritic pain.  (Tr. 986.)  Ms. Bruner reported her symptoms were aggravated by exertion and relieved by sitting and breathing

medications.  (*Id*.)  She reported her medications were working but seemed to be less effective at the end of the day, and that she needed to use her rescue inhaler every night.  (*Id*.)  On examination, all findings were in the normal range.  (Tr. 987.)  Dr. Heddleson noted Ms. Bruner was exposed to secondhand smoke in her home, and continued her medications, noting she refused the influenza and pneumonia vaccines.  (*Id*.)

On January 28, 2019, Ms. Bruner sought treatment from Dr. Todd M. Darmody, an endocrinologist.  (Tr. 989.)  She reported incapacitating exhaustion and a sleep disorder that Dr. Darmody opined was "likely sleep apnea," but she indicated she was unable to tolerate her CPAP.  (Tr. 995.)  Dr. Darmody suspected hypothyroidism and ordered tests to check thyroid function and antibodies.  (Tr. 996.)

### 2.  Opinion Evidence

#### i.  Opinion of Consultative Examiner

On September 29, 2016, Natalie A. Meyer, Psy.D., performed a psychological consultative examination of Ms. Bruner at the request of the State agency.  (Tr. 696.)  On examination, Ms. Bruner was cooperative and polite, with clear and logical thought processes and speech quality within normal limits.  (Tr. 698.)  She provided a wide range of affect, with appropriate eye contact and an appropriate mood.  (*Id.*)  She was alert, responsive, and oriented to all spheres.  (*Id.*)  While she had no difficulty following the conversation, she made some errors in calculating serial threes and sevens.  (Tr. 699.)  Dr. Meyer diagnosed Ms. Bruner with unspecified depressive disorder.  (*Id*.)  She noted that Ms. Bruner had no difficulty following conversationally and was able to complete math calculation tasks, but had some difficulty with verbal reasoning.  (Tr. 700.)  She noted that Ms. Bruner reported medical issues and symptoms of depression impacted her ability to complete activities of daily living, and reported being more

irritable and withdrawn recently.  (*Id.*)  She opined that Ms. Bruner's symptoms of depression may lead to decreased attention and concentration skills, and that work pressure may increase depressive symptomatology including tearfulness, withdrawal from others, slowed work performance, and poor frustration tolerance.  (Tr. 700-01.)

### ii.  Opinion of Treating Physician

On October 10, 2018, Dr. Kovolyan completed a Physical Capacity Evaluation which addressed impairments resulting from Ms. Bruner's atrial fibrillation, coronary artery disease with plaque per cath 9/28/15, cardiac pacemaker 7/28/14, COPD, diabetes, hypertension, hyperlipidemia, obesity, sick sinus syndrome, syncope, and cardioversion 1/4/16.  (Tr. 921.)  Dr. Kovolyan opined Ms. Bruner could walk less than 30 minutes in a work day, stand or sit less than 2 hours in a work day, and would require a job which allowed her to change positions at will.  (*Id.*)  She explained that Ms. Bruner was "deconditioned from being away from work for so long and no set exercise program on her own," and opined Ms. Bruner could not perform full time work.  (Tr. 921-22.)  She opined Ms. Bruner had the following functional limitations:

- could occasionally twist, stoop, bend, crouch, climb stairs and ladders and push or pull;

- must avoid moderate exposure to extreme cold and hazards such as heights;

- must avoid all exposure to extreme heat, humidity, fumes, odors, and dust; and

- could perform the identified activities 0-3 days per week, less than four consecutive weeks per month.

(*Id.*)  This evaluation was based in part on a functional capacity evaluation by physical therapist James Wurm on October 9, 2018, which Dr. Kovolyan cited and attached to her opinion.  (Tr. 924-25.)  Mr. Wurm had opined that Ms. Bruner was limited to sedentary or less than sedentary work and would perform best in an occupation that allowed frequent postural changes.  (*Id.*)

### iii.        Opinions of State Agency Reviewers

On September 9, 2016, State agency reviewing physician Lynne Torello, M.D., reviewed

the record and adopted an RFC determination made in a prior application for benefits on April

20, 2016.  That RFC limited Ms. Bruner as follows:

- light work;

- frequent balancing, crawling, crouching, and stooping;

- occasional climbing ramps and stairs;

- never climbing ladders, ropes, and scaffolds;

- less than concentrated exposure to extreme cold, heat, humidity, vibrations, fumes, odors, dust, gasses, and poorly ventilated areas; and

- less than moderate exposure to hazards such as unprotected heights and machinery.

(Tr. 102.)

On October 12, 2016, State agency reviewing psychiatrist Audrey Todd, Ph.D., reviewed

the record and opined that Ms. Bruner had the following mental functional limitations:

- able to complete both simple and multi-step tasks in situations in which duties are relatively static and changes can be explained;

- symptoms may increase with work stressors, yet she is able to adapt to a setting in which duties are routine and predictable.

(Tr. 103.)

On January 18, 2017, State agency reviewing psychiatrist Karla Delcour, Ph.D. and State

agency reviewing physician Michael Delphia, M.D., reviewed the record and concurred with the

findings of Dr. Torello and Dr. Todd.  (Tr. 133-34, 134-36.)

C.      **Hearing testimony**

1.  **Plaintiff's Testimony**

At her April 11, 2019 hearing, Ms. Bruner testified that she was unable to work because she had lung and knee issues that made it hard for her to climb steps or walk much, as well as heart issues that prevented her from lifting more than 30 pounds with her left arm.  (Tr. 45-47.) She also reported memory problems, depression, mood swings, and stated that she doesn't like to be around people.  (Tr. 47-48.)

With regard to her physical impairments, Ms. Bruner testified that she is "okay" with standing, but cannot walk far.  (Tr. 49.)  After walking about a city block, she reported that she would experience shortness of breath and need to sit for 15 or 20 minutes before resuming walking.  (Tr. 50.)  She reported chest pain about twice a day, depending on what she was doing, and feeling her heart race when she overexerted.  (Tr. 51.)  She stated that she needed help when shopping because she could not bend down to reach the bottom shelves or stretch to reach the top shelves, and said she pushed a cart so she would have something to lean on.  (*Id*.)  She also reported developing shortness of breath if she lifted more than 15 or 20 pounds.  (Tr. 52.)

Ms. Bruner also testified to diabetic neuropathy that made her feet and legs burn and tingle, reportedly at random times every day.  (Tr. 52-53.)  When that happened, she said she had to get off her feet altogether until the symptoms calmed down.  (Tr. 53.)  In addition, she reported that her lower back sometimes gave her constant pain, making it hard for her to sit, and that her knees creaked and felt sore.  (*Id*.)

With regard to her activities of daily living, Ms. Bruner testified that she lived in a two-story apartment with her husband and eight-year-old grandson.  (Tr. 54.)  She reported being able to take care of her own grooming and hygiene, but sometimes needing to sit down in the shower

because she got dizzy.  (Tr. 54-55.)  She reported doing as little housework as possible because she would get tired really easily.  (Tr. 55.)  She indicated that her grandson and husband helped, as did her daughter-in-law, son, and older grandsons who lived next door.  (Tr. 55-56.)  Some days, she testified that her son or daughter-in-law would go to the store for her because she did not want to be around anyone.  (Tr. 56.)

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 57-59.)  The VE classified Ms. Bruner's past work as that of a nurse aide.  (Tr. 57.)

For her first hypothetical, the ALJ asked the VE:

If I found that [Ms. Bruner] was capable of performing a full range of light work except for only occasional climbing of ramps and stairs, but never any ladder, rope, or scaffold; frequent balance, stoop, crouch, and crawl; occasional exposure to moving machinery and unprotected heights; occasional exposure to dust, fumes, and gases and poorly-ventilated areas; and occasional exposure to temperature extremes, humidity, and vibrations; and she retains the ability to understand, remember, and carry out simple, repetitive tasks; able to adapt to simple changes and avoid hazards in a setting without strict production quotas. Would she be able to return to any of that previous work?

(Tr. 57-58.)  The VE indicated that Ms. Bruner would not be able to perform her past work.  (Tr. 58.)  However, the VE indicated that the hypothetical individual could perform representative positions in the national economy that the described individual could perform, including inspector and hand packager, mail sorter, and office helper.  (*Id*.)  The VE provided job incidence data for each of the identified jobs.  (*Id*.)

Ms. Bruner's attorney asked the VE:

if we considered an individual with [Ms. Bruner's] age, education, and work experience and they were limited as the judge indicated in the original hypothetical, but in addition, it was at sedentary instead of light . . . . would there be any transferrable skills from her past work as a nurse aide?

18

(Tr. 58-59.)  The VE testified there are no transferrable skills from work as a nurse aide to sedentary work.  (Tr. 59.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.[4]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed

---

[4] Eligibility for Medicare Qualified Government Employee ("MQGE") benefits is limited to certain categories of former Federal employees. 20 C.F.R. § 404.1018(b).  For purposes of this appeal, the same legal standard is applicable to both SSI and MQGE claims.  *See* 42 C.F.R. §§ 406.12(a), 406.15(a) & (c).  Disability insurance benefits and supplemental security income are codified independently, but the regulations relevant to this case are virtually identical and therefore decisions rendered under 42 U.S.C. § 423 are also applicable to decisions rendered under 42 U.S.C. § 1381a.  *Sullivan v. Zebley,* 493 U.S. 521, 525 n. 3, 110 S.Ct. 885, 888–89 n. 3, 107 L.Ed.2d 967 (1990).

impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his May 6, 2019 decision, the ALJ considered the prior ALJ decision of April 26, 2016, which found Ms. Bruner capable of performing light work, with frequent balancing, crawling, crouching, and stooping, occasional climbing of ramps or stairs, no climbing of ladders, ropes, or scaffolds, less than concentrated exposure to extreme cold, heat, humidity, vibrations, fumes, odors, dust, gasses, or poorly ventilated areas, and less than moderate exposure to hazards such as unprotected heights and machinery (Tr. 18-20; *see also* Tr. 75-76).

The ALJ concluded that new and material evidence documented changes that would support a more restrictive residual functional capacity in this case, such that the provisions of *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) would not apply.  (Tr. 18-20.) However, he explained that the material changes supporting a more restrictive residual functional

20

capacity related specifically to Ms. Bruner's mental impairments, which were not found to be

severe at the time of the prior decision, explaining:

> Here, it should be noted the physical conditions generally remained, but the undersigned found some terms of the prior ALJ decision were vocationally irrelevant and needed updated for policy compliance.  Therefore, while the claimant continued to experience largely the same physical conditions and symptomology, the physical residual functional capacity was not adopted verbatim.  The undersigned found the record supported additional mental conditions/symptoms requiring a more overall restrictive residual functional capacity, accounting for mental limitations.

(Tr. 19.)

The ALJ then made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.  The claimant has not engaged in substantial gainful activity since August 11, 2016, the alleged onset date.

3.  The claimant has the following severe impairments: obesity; degenerative joint disease of the knees; degenerative changes in the spine with history of scoliosis; chronic obstructive pulmonary disease (COPD) with asthma; obstructive sleep apnea; diabetes mellitus; cardiac conditions, including atrial fibrillation, cardiomyopathy, history of ischemic heart disease with pacemaker, and history of hypertension; and a depressive disorder.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.

5.  The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except she could occasionally climb ramps and stairs, but would be precluded from climbing ladders, ropes, and scaffolds.  She could frequently balance, stoop, crouch, and crawl.  She could have occasional exposure to moving machinery and unprotected heights.  She could have occasional exposure to dust, fumes, gases, and poorly ventilated areas.  She could have occasional exposure to temperature extremes, humidity, and vibrations.  She retains the ability to understand, remember, and carry out simple, repetitive tasks.  She could adapt to simple changes and avoid hazards in a setting without strict production quotas.

6.  The claimant is unable to perform any past relevant work.

7.     The claimant was born in 1966 and was 50 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date.

8.     The claimant has at least a high school education and is able to communicate in English.

9.     Transferability of job skills is not material to the determination of disability.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including Inspector/Hand Packager, Mail Sorter, and Office Helper.

(Tr. 20-34.) [5]

Based on the foregoing, the ALJ determined that Ms. Bruner had not been under a disability, as defined in the Social Security Act, from August 11, 2016, through the date of the decision.  (Tr. 35.)

### V. Plaintiff's Arguments

Ms. Bruner asserts that the ALJ erred in analyzing the treating source opinion of Dr. Kovolyan for two reasons: because the ALJ's analysis was not sufficiently specific, and because the ALJ failed to make clear both the weight he gave to the opinion and the reason for that weight.  (ECF Doc. 17 p. 12.)

### VI. Law & Analysis

A.    **Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

---

[5] The ALJ's findings are summarized.

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (*quoting Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## B.    Assignment of Error:  Opinion of Dr. Kovolyan

Ms. Bruner asserts that the ALJ erred in analyzing the treating source opinion of Dr. Kovolyan.  (ECF Doc. 17 p. 12.)  She argues the ALJ failed to make clear both the weight he gave to the opinion and the reason for that weight, and further that the ALJ's analysis was not sufficiently specific because he failed discuss Ms. Bruner's cardiac and breathing impairments within his analysis of Dr. Kovolyan's opinion, even though Dr. Kovolyan had listed those diagnoses as part of the basis for her opinion.  (*Id*. p. 13-14.)

The Commissioner responds that the ALJ reasonably concluded that the Dr. Kovolyan's opinion was "entitled to no more than partial weight" because it was not entirely consistent with

Ms. Bruner's treatment records, and notes that the ALJ provided a detailed analysis of each functional limitation set forth in Dr. Kovolyan's opinion.  (ECF Doc. 19 pp. 7-8.)  The Commissioner also points out that the ALJ discussed Ms. Bruner's cardiac and breathing impairments in detail earlier in the opinion, and provided multiple reasons as to why the treatment records were consistent with the specified RFC limitations.  (*Id*. p. 9.)

The Sixth Circuit has provided detailed instructions regarding the weight to be given the opinion of a treating source:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).
>
> If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).
>
> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id*. § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 376 (6th Cir. 2013).[6]  While the regulations do require an ALJ to consider the factors set forth in 20 C.F.R. § 404.1527(d)(2) in determining the weight to give a treating source opinion, they do not require a factor-by-factor analysis, only that

---

[6]  Revised versions of these regulations apply to disability claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844 (March 27, 2017). The claim at issue in this case was filed on July 7, 2016, prior to the regulatory change.

the decision include good reasons for the weight assigned.  *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011).

### 1.    Weight of the Opinion

In arguing that the ALJ failed to clearly set forth the weight given to this treating source opinion, Ms. Bruner first notes that the ALJ described the "sitting, standing, and walking limits" in Dr. Koyloyan's opinion as "less persuasive" (ECF Doc. 17 p. 13), language that could be read as a reference to the persuasiveness standard that became applicable to later-filed applications for benefits.  What Ms. Bruner fails to acknowledge in making this argument is the fact that the ALJ ultimately concluded his analysis of the opinion with an explicit statement that "overall the undersigned finds [sic] this opinion no more than partial weight." (Tr. 32.)

In support of his decision to afford the opinion partial weight, not controlling weight, the ALJ provided the following detailed explanation:

> The undersigned has read and considered the opinion of Dr. Lovolyan [sic] M.D., evidenced at Exhibit 14F.  The undersigned finds the lifting and carrying limitations not inconsistent with the evidentiary record.  The record supports a history of obesity and breathing conditions, as well as cardiac related impairments, including the placement of a pacemaker.  However, the undersigned finds the record does not support greater reductions as argued by the attorney, as the claimant herself reported she could lift up to at least 30-40 pounds.  The undersigned finds sitting, standing, and walking limits cited by the physician less persuasive.  Here, the cited limits are more restrictive than reported by the claimant and are not consistent with the objective evidence.  While the record supported some knee degeneration, the claimant was not involved in active treatment for the condition, suggesting the reports of pain and the condition were not as significant as she alleged. The claimant reported ongoing back pain, but the record during the period under consideration, contained no active treatment for her back. The claimant was not taking muscle relaxers or pain medications and was not involved in even conservative treatment with a chiropractor or physical therapy.  Further, she reported to her treatment providers that she remained active without issue and was able to walk every other day for a couple of hours.  The undersigned finds the lack of a need for an assistive device consistent with the evidence, as the record suggests no lower extremity instability or atrophy and the claimant was observed to have a normal gait.  The undersigned finds the manipulative limitations inconsistent with the record, as the record documented no upper extremity hand/arm/writs impairment that would

affect the use of the claimant's arms, hands, fingers, etc.  The claimant reported diabetic neuropathy; however, she reported only neuropathic symptoms in her feet. The undersigned finds postural limits are supported by the claimant's cardiac, diabetic, breathing conditions and her obese body habitus; however, the undersigned finds as she is not receiving treatment for her knee or back condition, the limitations are not as significant as the provider reports.  The undersigned finds, as the claimant has no injury to the upper extremities limitation on pushing/pulling is not supported.  The undersigned finds the environmental limits not inconsistent with the evidence, but the undersigned finds the total preclusion to atmospheric conditions more restrictive than the claimant's subjective reports that she maintains exposure to second hand smoke and her ability to walk for a couple hours outside her home in May when exposed to both heat and humidity.  The undersigned gives less weight to the preclusion on mental limits, as the cited physician is not notably a mental health specialist.  Further, the record does document the claimant was diagnosed with a depressive disorder and required medications, suggesting the record supported greater mental limits.  The undersigned finds the opinion the claimant could work 0-3 days per week and less than 4 consecutive weeks per month inconsistent with the objective evidence of record.  The claimant was not routinely seeking emergency treatment for symptom exacerbation nor did she routinely require hospitalization.  The record does not support her treatments required any recovery period.  <u>Therefore, overall the undersigned finds [sic] this opinion no more than partial weight</u>.

(Tr. 31-2 (emphasis added).)

A plain reading of the text reveals that the ALJ ultimately assigned "partial weight" to Dr. Kovolyan's opinion, following a nuanced review and explanation of how he weighed each category of functional limitations addressed in the opinion.  The use of the term "less persuasive" in one portion of that discussion does not undermine the clarity of the ultimate finding.  (Tr. 31.) Neither does the ALJ's discussion of Ms. Bruner's back or knee impairments undo the fact that he also discussed her "cardiac, diabetic, breathing conditions and her obese body habitus" in assigning weight to the opinion.  (Tr. 32.)  For the reasons stated, the Court finds no support for Ms. Bruner's assertion that the ALJ "fails to make clear to subsequent reviewers the weight he gave the opinion."  (ECF Doc. 17 p. 12.)

## 2.      Specificity of Explanation

Next, Ms. Bruner asserts that the ALJ failed to articulate "sufficiently specific" good reasons for assigning Dr. Kovolyan's opinion only partial weight.  (*Id*.)  She focuses on the ALJ's explanation for finding the sitting, standing, and walking limitations in Dr. Kovolyan's opinion less persuasive, and argues that the analysis does not meet the level of specificity required by the regulations because the ALJ: (i) assertedly failed to mention Ms. Bruner's cardiac or breathing impairments in his analysis of her postural limitations; and (ii) failed to acknowledge Dr. Kovolyan's statement within the opinion that deconditioning contributed to Ms. Bruner's lack of positional tolerance.  (*Id*. pp. 13-14.)

### i.      Discussion of Cardiac and Breathing Impairments

First, Ms. Bruner is not factually correct in asserting that that the ALJ "fail[ed] to discuss, to any degree, Ms. Bruner's cardiac and breathing impairments within his analysis of Dr. Kovolyan's opinion."  (ECF Doc. 17 p. 14.)  These impairments were specifically noted at two different points in the relevant paragraph, as follows:

- "The record supports a history of obesity and breathing conditions, as well as cardiac related impairments, including the placement of a pacemaker. However, the undersigned finds the record does not support greater reductions as argued by the attorney, as the claimant herself reported she could lift up to at least 30-40 pounds."  (Tr. 31.)

- "The undersigned finds postural limits are supported by the claimant's cardiac, diabetic, breathing conditions and her obese body habitus; however, the undersigned finds as she is not receiving treatment for her knee or back condition, the limitations are not as significant as the provider reports."  (Tr. 32.)

Second, it is noted that Ms. Bruner's selective discussion of a mere three sentences from the larger paragraph discussing this opinion deprives the ALJ's analysis of its full context.  An examination of the full paragraph reveals a clear and well-articulated analysis in support of the

partial weight afforded to Dr. Koyolyan's opinion.  The ALJ found certain portions of Dr. Koyolyan's opinion to be supported by the objective evidence, while other portions were found to be inconsistent in light of limited objective findings in treatment records and the level of treatment undertaken by Ms. Bruner for her various impairments (ranging from conservative to an apparent lack of any treatment).  (Tr. 31-32.)  In the context of the specific arguments offered by Ms. Bruner, it is also noteworthy that the ALJ cited to Ms. Bruner's reports to her treating cardiovascular specialist when he observed that she "reported to her treatment providers that she remained active without issue and was able to walk every other day for a couple of hours."  (Tr. 31, *citing* Tr. 950, 945, 718.)[7]

It is well-established that a "good reason" for assigning less than controlling weight to a treating physician's opinion "is if a treating source's opinion is inconsistent with the rest of the evidence."  *Gipson v. Comm'r of Soc. Sec.,* No. 5:16-cv-1108, 2017 WL 3732009, at *8 (N.D. Ohio Aug. 30, 2017) (*citing Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993)).  The clear language in the above-quoted paragraph establishes that this is the ALJ's primary underlying basis for affording only partial weight to Dr. Koyolyan's opinion.

To the extent that Ms. Bruner contends the paragraph in question failed to adequately address her pulmonary and cardiac impairments, review of the ALJ's decision as a whole provides further context.  (Tr. 18-20, 26-28.)  The Sixth Circuit has repeatedly explained that an ALJ need not "reproduce the list of these treatment records a second time when she explained why [a treating source] opinion was inconsistent with this record."  *Crum v. Comm'r of Soc. Sec*., 660 F. App'x 449, 457 (6th Cir. 2016); *citing Forrest v. Comm'r of Soc. Sec*., 591 F. App'x 359, 366 (6th Cir. 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need

---

[7] The records cited are the treatment notes of Dr. Cooke, a cardiologist and member of the specialized Ohio Health Heart and Vascular Physicians practice.  (Tr. 725.)

to require the ALJ to "spell out every fact a second time").  Here, the ALJ outlined Ms. Bruner's COPD / asthma treatment history, and found the records supported a finding that "the claimant's symptoms were well managed with her prescribed medications," with no need for more invasive treatment. (Tr. 26-27.)  He also outlined her cardiac treatments and related findings, noting that her cardiologists' treatment notes regularly described her condition as "stable," with treatment and interventions limited to medication and continued use of her pacemaker.  (Tr. 27-28.) Providing further context, the ALJ explicitly found that all of the physical treatment records since the prior ALJ decision in 2016 demonstrated that Ms. Bruner "continued to experience largely the same physical conditions and symptomology" as those addressed in the prior ALJ decision, where the ALJ found her capable of light work.  (Tr. 19.)[8]

In this context, it is evident that ALJ appropriately described his consideration of the evidentiary record relating to all of Ms. Bruner's severe impairments, including her pulmonary and cardiac impairments, sufficient to support a finding that he articulated good reasons for assigning only partial weight to Dr. Kovolyan's treating opinion.

### ii.    Failure to Specifically Address Reported Deconditioning

Ms. Bruner points out that Dr. Koyolyan's opinion includes a statement that Ms. Bruner was "[d]econditioned from being away from work so long now and no set exercise program on her own," (Tr. 921), and argues that the partial weight the ALJ gave to the opinion lacks the required specificity because he "made no reference" to this notation regarding to deconditioning in his analysis.  (ECF Doc. 17 p. 14.)

---

[8] The ALJ explained that the only changes applied to the prior ALJ's physical RFC consisted of clarifying language for vocational relevance and policy compliance. (Tr. 19.)

As a preliminary matter, it is noted that Ms. Bruner has provided no authority to support the proposition that an ALJ's discussion of a treating opinion must include a specific analysis of every individual finding, observation, or notation set forth within that opinion.  The standard remains whether the ALJ has provided "good reasons" for discounting treating physicians' opinions which are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. R. 96–2p, 1996 WL 374188, at *5.

It is further noted that "[d]econditioning is not a medically determinable physical impairment within the meaning of the Social Security Act."  *Buehrens v. Berryhill*, No. 1:16CV354-WTH/CAS, 2017 WL 8219020, at *11 (N.D. Fla. Sept. 19, 2017), *report and recommendation adopted*, No. 116CV00354WTHCAS, 2018 WL 1278758 (N.D. Fla. Mar. 12, 2018); *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 806–7 (11th Cir. June 3, 2013) (unpublished); *Pinkins v. Astrue*, Civil Action No: 09–6920 Section: "D" (5), 2010 WL 3825433, at *10 (E.D. La. Sept. 8, 2010), *approved and adopted by*, 2010 WL 3829354, 2010 U.S. Dist. LEXIS 102693 (E.D. La. Sept. 24, 2010); *Sturgill v. Astrue*, Case No. 1:08-CV-687, 2010 WL 715672, at *3–4 (S.D. Ohio Feb. 23, 2010).

Instead, the Social Security Agency's Revised Criteria for Determination of Disability defines the term "deconditioned," as "the reversible exercise intolerance that comes from a lack of activity, such as from prolonged hospitalization, but which resolves with therapy."[9]  II-4-1-7

---

[9]  Courts have also defined "deconditioning" in similar ways. *Buehrens v. Berryhill*, No. 1:16CV354-WTH/CAS, 2017 WL 8219020, at *5 (N.D. Fla. Sept. 19, 2017), *report and recommendation adopted*, No. 116CV00354WTHCAS, 2018 WL 1278758 (N.D. Fla. Mar. 12, 2018); *citing King v. Colvin*, No. 12 C 9280, 2014 WL 1698352, at *3 n.7 (N.D. Ill. Apr. 29, 2014) ("'Deconditioning' means 'a state of prolonged underuse of muscles.'" (citation omitted)); *Ramsey v. Colvin*, Case No. 4:12-CV-1003-NAB, 2013 WL 5406609, at *5 n.3 (E.D. Mo. Sept. 25, 2013) ("Deconditioning means to cause or lose fitness or muscle tone, especially through lack of exercise." (citation omitted)); *Furtado v. Astrue*, C.A. No. 07-387ML, 2008 WL 2950782, at *12 n.3 (D. R.I. July 25, 2008) ("Although the ALJ does not define the term 'deconditioning,' the Court assumes that she means that Plaintiff's lack of activity resulted in him becoming 'out of shape'").

Revised Medical Criteria For Determination of Disability, Cardiovascular System (final Rules; 59 Fr 6468, February 10, 1994), 1996 WL 1586736, at *42.

While the ALJ did not specifically discuss the reference to deconditioning, a review of the decision as a whole reflects that he did explicitly consider evidence of record relevant to deconditioning, including Ms. Bruner's periodic reports of shortness of breath, wheezing, or dyspnea on exertion (Tr. 26-27), testimony regarding chest pains (Tr. 28) and fatigue (Tr. 26), and reported issues with climbing stairs at home (Tr. 25). Conversely, he also noted record evidence that was inconsistent with Ms. Bruner's asserted limitations in standing, walking, and otherwise exerting herself, including reports that Ms. Bruner was engaging in physical exercise and walking for a couple of hours every other day (Tr. 25-27), was observed to ambulate with a normal gait and without lower extremity atrophy or instability (Tr. 25), described herself as "active" (Tr. 25-27), was not remaining compliant with her CPAP device (Tr. 26), did not experience lower extremity ulcerations relating to her diabetic neuropathy (*Id.*), only reported "intermittent" or "waxing and waning" breathing symptoms (Tr. 26-27), denied angina or palpitations to her treating cardiac provider (Tr. 27-28, 30), and performed activities of daily living that included driving, grocery shopping, preparing meals, performing household chores with breaks, and independently caring for her personal needs (Tr. 29). He also noted that her various physical conditions were being treated conservatively, and were generally stable with conservative treatment. (Tr. 31.)

In this context, it is evident that ALJ appropriately considered Ms. Bruner's potential deconditioning in affording only partial weight to Dr. Kovolyan's treating opinion, having articulated good reasons for finding the complete record inconsistent with certain of the limitations described in that opinion.

Accordingly, and for all of the reasons set forth in further detail above, the undersigned finds that this assignment of error is without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

*/s/Amanda M. Knapp*

November 10, 2021

_____

AMANDA M. KNAPP
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).